IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
CENTRAL DIVISION

BROOKLYN PAIGE LESLIE                                                                PLAINTIFF

v.                              NO. 4:22-cv-01083-BRW-PSH

KILOLO KIJAKAZI, Acting Commissioner                                        DEFENDANT
of the Social Security Administration

FINDINGS AND RECOMMENDATION

INSTRUCTIONS

The following proposed Recommendation has been sent to United States District Judge Billy Roy Wilson. You may file written objections to all or part of this Recommendation. If you do so, those objections must: (1) specifically explain the factual and/or legal basis for your objection, and (2) be received by the Clerk of this Court within fourteen (14) days of this Recommendation. By not objecting, you may waive the right to appeal questions of fact.

## DISPOSITION

Plaintiff Brooklyn Paige Leslie ("Leslie") challenges the denial of her application for supplemental security income payments and her application for child's insurance benefits based on disability. She does so on one ground. Leslie maintains that the Appeals Council erred when it found her "new and material evidence 'does not relate to the period at issue' and therefore would not change the outcome of the decision" of the Administrative Law Judge ("ALJ"). See Docket Entry 21 at CM/ECF 3. Because substantial evidence on the record as a whole supports the ALJ's decision, and he committed no legal error, the undersigned recommends that his decision be affirmed and this case be dismissed.

Leslie was born on December 3, 1998. She represents that she became disabled on May 1, 2019, or four months after her twentieth birthday, as a result of, inter alia, an attention deficit hyperactivity disorder ("ADHD"), anxiety, and depression.

On July 23, 2019, Leslie filed her application for supplemental security income payments. The following month, she filed her application for child's insurance benefits based on disability. As to the relevant period in this case, she represents the following:

> In both CDB (i.e., child disability benefits) and SSI (i.e., supplemental security income) claims the standard for evaluating disability is the same. In a CDB claim, where benefits are based on the earnings record of a parent who is deceased, disabled, or retired, the claimant carries the additional requirement to demonstrate that she was disabled on or before her 22nd birthday, in this case on or before December 3, 2020. ... In an SSI claim, the claimant need only show that she was disabled at any time between the date of the application and the date of the ALJ's decision.

See Docket Entry 21 at CM/ECF 1 n.1.

The record reflects that Leslie has struggled with intellectual deficits, anxiety, and depression since well before the alleged onset date. For example, on October 19, 2010, Leslie was seen by Dr. June Nichols, Psy.D., ("Nichols") for a psychological evaluation. See Transcript at 435-438. Nichols recorded Leslie's history and noted that she had been enrolled in Special Education classes throughout her schooling, a fact confirmed by an Individualized Education Plan. See Transcript at 373-384. A mental status examination was unremarkable, although Leslie's judgment and insight were poor. Testing indicated that she was functioning in the borderline range of intellectual ability. Nichols' diagnoses included ADHD and borderline intellectual functioning. Nichols opined, in part, that Leslie's concentration, persistence, and pace were impaired, and she would have difficulty relating to peers and authority figures.

On January 4, 2018, Leslie was seen by Jack Bentley, Jr., Ph.D. ("Bentley") for a mental examination. See Transcript at 453-455. Leslie's history of illness was recorded to include the following:

> The client first started experiencing psychiatric problems during childhood. There was evidence of depression, anxiety and crying spells at 7 to 8 years of age. She was initially evaluated by (a) psychiatrist at the CED MHC. The claimant and her mother consulted this facility on three or four occasions but were dissatisfied with the services. She subsequently consulted a local psychiatrist, Dr. Carr, and was treated by him for 2 to 3 years. The patient was prescribed a regimen of Elavil and a low dose of a stimulant medication to treat symptoms of ADHD as well as a sleep disorder.
>
> The claimant subsequently started receiving services from another psychiatrist, Dr. Randolph ... She continues to be treated by this physician at the Quality of Life program. The client is taking a dose of Vyvanase in the morning ... as well as in the afternoons. The use of this stimulant medication has improved her concentration and attention span. The patient adds that she has more energy most days.
>
> Although she has rarely experienced any depression over the last two years, the client continues to experience significant anxiety in social situations. She often imagines that people are watching her while she attempts to communicate with people in her vicinity. The claimant has been experiencing anxiety [in] social situations for at least three years. The symptoms have improved since she discontinued her education.
>
> The patient has never been hospitalized for psychiatric reasons. There's been no evidence of suicidal ideation, hallucinations or paranoia. The client is often frustrated and irritable when attempting many simple academic tasks. She has never been hospitalized for mental health reasons.

See Transcript at 453. Leslie reported that she had stopped attending school in the Fall of 2017, had thereafter begun homeschooling, and was scheduled to receive her high school diploma in May of 2018. She reported begin able to read and write "reasonably well" but described herself as having poor comprehension skills. See Transcript at 454. A mental status examination was unremarkable, although her vocabulary was "rather impoverished" and she failed to state "the number of weeks in a year, the direction in which the sun rises, or the author of Hamlet." See Transcript at 454. Her daily activities were routine, and she could complete her activities of daily living without assistance. Bentley's diagnoses included an attention deficit disorder, a mild to moderate generalized anxiety disorder, and probable borderline intellectual functioning. He additionally observed the following:

> Based on the results of this examination, the patient would have marked deficits in her ability to perform complex or repetitive work-related activities. Her impairment level for simple tasks would fall in the mild to moderate range. The claimant would have a similar limitation in her ability to maintain effective communication with coworkers and supervisors. In a supportive environment, she would seem to have little difficulty performing single and two-step work-related activities when so motivated.

See Transcript at 455.

On the heels of Bentley's examination, Leslie sought care for her ADHD, anxiety, and depression at Quality of Life Health Services. <u>See</u> Transcript at 475-482 (02/08/2018), 483-490 (03/08/2018), 491-497 (05/03/2018), 498-506 (07/12/2018), 507-514 (09/06/2018), 515-524 (11/13/2018), 525-532 (11/29/2018). The progress notes reflect that Leslie's symptoms fluctuated, although the results of her mental status examinations were largely unremarkable. She was continued on medication that included Adderall. She was repeatedly diagnosed with ADHD, which was characterized as moderate; a generalized anxiety disorder; and a major depressive disorder, which was characterized as mild.

Leslie also sought care at Neurological Specialists for headaches she was experiencing. <u>See</u> Transcript at 542-543 (03/01/2018), 540-541 (06/04/2018), 538-539 (12/10/2018), 535-537 (03/12/2019). The progress notes from the presentations also contain observations about her anxiety and depression. Leslie oftentimes reported being irritated and in a bad mood, but her mental status examinations were otherwise unremarkable. She reported that she was tolerating Adderall but later reported discontinuing the medication because it made her "pull her hair and her blood pressure was elevated." See Transcript at 535. She hoped to re-start Wellbutrin.

Leslie saw Dr. Benjamin Carr, M.D., ("Carr") on at least four occasions between May 24, 2019, and September 8, 2020, for complaints of anxiety and depression. See Transcript at 463-464 (05/24/2019), 460-462 (01/16/2020); 559-561 (04/01/2020), 556-558 (09/08/2020). The progress notes reflect that Leslie was having trouble sleeping and controlling her anger. She reported struggling with focus and attention, lacking motivation, and having no energy. Her mood and affect were typically irritable, sad, or anxious, and her symptoms were exacerbated by relationship difficulties. Her mental status examinations were otherwise unremarkable. She initially reported that Seroquel helped stabilize her mood but later reported that the mediation had lost its efficacy. Carr repeatedly diagnosed a generalized anxiety disorder and a mood disorder and noted that psychotherapy was focused on "problems with relationships." See Transcript at 557.

State agency physicians Drs. Robert Estock, M.D., ("Estock") and Virginia Bare, Ph.D., ("Bare") reviewed Leslie's medical records as a part of the agency's review of Leslie's application for supplemental security income payments and application for child's insurance benefits based on disability. See Transcript at 139-145, 167-171. Estock and Bare agreed that Leslie had no more than moderate mental limitations.

Leslie testified during the July 26, 2021, administrative hearing. See Transcript at 99-123. She graduated from high school, taking more special classes than regular classes. She worked at Panera Bread for approximately six months but stopped working, in part, because of her anxiety. She attempted to work at Dollar General Store, but she was unable to work more than one day because of her anxiety. When Leslie gets anxious, she gets a "heavy, weighed down, sick feeling," her head starts hurting, she starts shaking, and she begins crying uncontrollably. See Transcript at 107. It typically takes her three days to recover from her symptoms, and they only subside when she stays home and is able to relax. Her ADHD causes her difficulty focusing and possibly contributes to her mood disorder. She takes Buspar for her anxiety, which helps about half of the time, and Adderall for her ADHD, which "helps a lot." See Transcript at 113.

The ALJ assessed Leslie's residual functional capacity and found that she is capable of performing medium work that permits, inter alia, "minimum work-related job changes," and "occasional contact with the general public, co-workers, and supervisors." See Transcript at 41. The ALJ additionally found that Leslie is able to "understand, remember, [and] carry out simple, routine tasks involving one or two step instructions." See Transcript at 41. In assessing Leslie's residual functional capacity, the ALJ

8

found Bentley, Estock, and Bare's medical opinions persuasive because their opinions are consistent with the medical evidence. The ALJ found Nichols' medical opinions unpersuasive because they are remote in time. At step five of the sequential evaluation process, the ALJ found that someone of Leslie's age, education, and residual functional capacity can perform jobs existing in the national economy, and Leslie is therefore not disabled within the meaning of the Social Security Act.

Leslie challenged the ALJ's decision by filing a request for review with the Appeals Council. As a part of the request for review, Leslie submitted, inter alia, Nichols' December 27, 2021, psychological evaluation of Leslie, see Transcript at 73-77, and Nichols' January 21, 2022, Mental Health Source Statement in which she addressed Leslie's limitations, see Transcript at 78.[1] In the psychological evaluation, a mental status examination of Leslie was largely unremarkable, and Nichols estimated that Leslie was functioning in the average range of intellectual ability. Nichols diagnosed, in part, ADHD and a major depressive disorder and offered the following assessment of Leslie:

---

[1] As a part of the request, Leslie also submitted the progress notes from her most recent presentations with Carr. See Transcript at 88-90 (12/01/2020), 85-87 (03/02/2021), 82-84 (05/20/2021), 79-81 (08/12/2021), 29-31 (11/04/2021). The notes are largely consistent with Carr's prior notes, although Leslie did report that her mood was better since she began taking Pristiq.

Ms. Leslie received help in school because of issues with reading and spelling, and described symptoms consistent with dyslexia. Both of her parents have been diagnosed with dyslexia, but she was never tested.

Ms. Leslie has been involved with psychiatric care since she was an adolescent. She has been treated for anxiety, depression, and ADHD. Symptoms have never resolved, in fact she has been tried on multiple medications and history indicates a pattern where medications are prescribed, increased, side effects create a problem, then medications are stopped, new medications are prescribed, increased, side effects create a problem, the medication is stopped, and a different medication is prescribed. She has at time(s) gone back to medications that have been tried previously, but at different dosages. Yet symptoms continued and in fact are reported to maybe mildly improve for a short period, but the anxiety has never resolved and the depression has gotten much more severe. She reported experiencing both auditory and visual hallucinations recently.

Her ADHD symptoms have followed the same pattern of treatment. Medications have worked for a period, then seemed less beneficial or there was a side effect issue, so medications were changed, and then this was repeated. Ms. Leslie can understand, remember and carry out very short and simple instructions. She cannot maintain attention, concentration and/or pace for periods of at least two hours. She cannot perform activities within a schedule and be punctual within customary tolerances. She cannot sustain an ordinary routine without special supervision. She cannot adjust to routine and infrequent work changes. She can interact with supervisors and/or co-workers. She can maintain socially appropriate behavior and adhere to basis standards of neatness and cleanliness. In addition to normal workday breaks, she would likely be off task 25% of an 8-hour day. She would likely miss 3-4 days in a 30-day work period due to her psychological symptoms.

See Transcript at 76-77. In the Mental Health Source Statement, Nichols confirmed the representations she made in her psychological evaluation, e.g., Leslie cannot maintain attention, concentration, and/or pace for periods of least two hours; she cannot perform activities within a schedule and be punctual within customary tolerances, and she cannot sustain an ordinary routine without special supervision.

The Appeals Council considered the additional evidence, including Nichols' psychological evaluation of Leslie and the Mental Health Source Statement, but found that the evidence did not provide a basis for reviewing the ALJ's decision. The Appeals Council so found for the following reasons:

> You submitted evidence from Carr Mental Wellness, December 1, 2020 to August 12, 2021, 12 pages. We find this evidence does not show a reasonable probability that it would change the outcome of the decision. We did not exhibit this evidence.
>
> You submitted evidence from Carr Mental Wellness, November 4, 2021, 3 pages; and June Nichols, Psy.D., Gadsen Psychological Services, December 27, 2021, 5 pages and January 21, 2022, 1 page. The Administrative Law Judge decided your case through September 24, 2021. This additional evidence does not relate to the period at issue. Therefore, it does not affect the decision about whether you were disabled beginning on or before September 24, 2021.

See Transcript at 2.

Leslie maintains that the Appeals Council erred when it found that Nichols' most recent psychological evaluation does not relate to the period at issue and does not affect the ALJ's decision. Specifically, Leslie maintains that the Appeals Council erred in rejecting the evaluation "based solely on the <u>date</u> of the evidence rather than considering whether it was related to the period on or before the date of the hearing decision." See Docket Entry 21 at CM/ECF 6 (emphasis in original). She acknowledges, as she must, that the evaluation took place after the ALJ's decision but maintains that the "pertinent question is whether the evidence <u>has any bearing on whether she was disabled during the period</u>." See <u>Id</u>. (emphasis in original). Leslie maintains that the evaluation bears on that question, and the Appeals Council should have reviewed the ALJ's decision.

The Acting Commissioner of the Social Security Administration ("Commissioner") disagrees. She notes that the Appeals Council evaluates evidence submitted in connection with a request for review to determine if the evidence is new, relevant, material, and reasonably would change the outcome. If the evidence meets the criteria, only then can the Appeals Council review the ALJ's decision. The Commissioner maintains that even if Leslie could show that Nichols' most recent evaluation is related to the period at issue, the evaluation reasonably would not change the outcome.

The ultimate question for the undersigned is whether the ALJ's findings are supported by "substantial evidence on the record as a whole and not based on any legal error." See Sloan v. Saul, 933 F.3d 946, 949 (8th Cir. 2019). "Substantial evidence is less than a preponderance, but enough that a reasonable mind would accept it as adequate to support the [ALJ's] conclusion." See Id. "Legal error may be an error of procedure, the use of erroneous legal standards, or an incorrect application of the law." See Lucus v. Saul, 960 F.3d 1066, 1068 (8th Cir. 2020) (quoting Collins v. Astrue, 648 F.3d 869, 871 (8th Cir. 2011) (citations omitted)).

When the Appeals Council denies a request for review after the submission of additional evidence, the Appeals Council's decision to deny review is not evaluated. See Hawthorne v. Saul, No. 20-cv-2009-ELW-PKH, 2020 WL 6106608 (W.D. Ark. Sept. 30, 2020), report and recommendation adopted, No. 20-cv-2009-PKH, 2020 WL 6092344 (W.D. Ark. Oct. 15, 2020). Instead, it must be determined whether the record as a whole, including the new evidence, supports the ALJ's decision. See Id., 2020 WL 6106608, 2 (citing McDade v. Astrue, 720 F.3d 994 (8th Cir. 2013)). The inquiry requires "speculat[ion] on how the ALJ would have weighed the newly submitted evidence had it been available at the initial hearing." See Id., 2020 WL 6106608, 2 (citing Flynn v. Chater, 107 F.3d 617 (8th Cir. 1997)).

Were the undersigned called upon to determine the adequacy of the reason the Appeals Council gave for its treatment of Nichols' most recent psychological evaluation, it would not be an easy undertaking. Although the evaluation was completed approximately three months after the ALJ's decision, the evaluation undoubtedly sheds some light on the state of Leslie's mental health during the relevant period in this case. For instance, Nichols noted that Leslie has been receiving "psychiatric care since she was an adolescent" and opined that her symptoms have "never resolved." See Transcript at 76. The undersigned is not, though, called upon to determine the adequacy of the Appeals Council's reason. Instead, the undersigned is called upon to determine whether the record as a whole, including the new evidence, supports the ALJ's decision. The undersigned finds that the record as a whole, even when considering the evaluation, supports the ALJ's decision, and the undersigned is not persuaded that the evaluation reasonably would change the outcome.

The ALJ is required to assess the claimant's residual functional capacity, which is a determination of the most the claimant can do despite her limitations. See Brown v. Barnhart, 390 F.3d 535 (8th Cir. 2004). The assessment is made using all of the relevant evidence in the record. See Jones v. Astrue, 619 F.3d 963 (8th Cir. 2010).

In assessing the claimant's residual functional capacity, the ALJ must consider the medical opinions in the record. See Wagner v. Astrue, 499 F.3d 842 (8th Cir. 2007). The regulations governing the consideration of medical opinions were revised for claims filed on or after March 27, 2017, which Leslie's claims were. The revised regulations provide that the ALJ will not give any specific weight to medical opinions. See Phillips v. Saul, No. 1:19-cv-00034-BD, 2020 WL 3451519 (E.D. Ark. 2020). Instead, the ALJ will determine the persuasiveness of each medical source or prior administrative medical findings based on supportability, consistency, relationship with the claimant, specialization, and any other factor that tends to support or contradict a medical opinion.

Here, substantial evidence on the record as a whole supports the ALJ's assessment of Leslie's residual functional capacity. The undersigned so finds for at least four reasons.

First, the progress notes complied during Leslie's presentations with Quality of Life Health Services and Neurological Specialists reflect largely unremarkable findings. The notes reflect that she typically had normal thought content, normal perception, logical thought process, average intelligence, normal insight, intact attention and cognition, and good insight and judgment.

Second, Leslie's daily activities suggest that her limitations are not as severe as she alleges. The ALJ could and did find that Leslie is capable of preparing her own meals, performing household chores, shopping in stores, and driving short distances. Bentley, in fact, noted that Leslie "likes to read, listen to music, and write short stories." See Transcript at 454.

Third, the ALJ gave a good reason for finding unpersuasive Nichols' medical opinions expressed in her October 19, 2010, psychological evaluation of Leslie. The ALJ found that they are remote in time, and he could so find as they were made more than eight years before the alleged onset date in this case.

Fourth, the ALJ gave a good reason for finding persuasive Bentley's medical opinions expressed in his January 4, 2018, mental examination of Leslie, opinions that Leslie has mild to moderate limitations in her ability to perform simple tasks and maintain effective communication with co-workers and supervisors. The ALJ found that Bentley's opinions are consistent with the record, and he could so find as they are consistent with an acceptable characterization of the record. Specifically, Bentley's opinions are consistent with the progress notes from Quality of Life Health Services and Neurological Specialists, consistent with Leslie's daily activities, and consistent with the opinions expressed by Estock and Bare.

What of Nichols' most recent psychological evaluation of Leslie, specifically, how would the ALJ have weighed the evaluation had it been available at the time of the administrative hearing? The significance of the evaluation is likely capable of more than one acceptable interpretation. Nevertheless, the evaluation reasonably would not change the outcome for at least two reasons.

First, the evaluation is a one-time assessment of Leslie's mental health. The evaluation was not made as a part of a course of treatment, and there is nothing to indicate that Nichols saw Leslie between the October 19, 2010, evaluation and the more recent evaluation. The more recent evaluation thus stands on the same footing as the mental examination of Leslie made by Bentley.

Second, Nichols' more recent evaluation is inconsistent with the ALJ's acceptable assessment of the evidence in the record. Specifically, the evaluation is inconsistent with the ALJ's acceptable assessment of the progress notes from Quality of Life Health Services and Neurological Specialists, inconsistent with the ALJ's acceptable assessment of Leslie's daily activities, inconsistent with the ALJ's acceptable assessment of Bentley's medical opinions, and inconsistent with the ALJ's acceptable assessment of the opinions expressed by Estock and Bare.

It is for the foregoing reasons that substantial evidence on the record as a whole supports the ALJ's findings, and he did not commit legal error. The undersigned therefore recommends that the ALJ's decision be affirmed. Leslie's complaint should be dismissed, all requested relief should be denied, and judgment should be entered for the Commissioner.

DATED this 4th day of August, 2023.

_____
UNITED STATES MAGISTRATE JUDGE